AMBRO, Circuit Judge, Dissenting:
Arcadia brought this lawsuit to enforce two agreements reached by written corre *169 spondence with Sun in September and October of 2000. The District Court offered two rationales for why Arcadia cannot do so and my colleagues in the majority follow an alternative course to reach the same conclusion. I cannot follow any of the various paths of reasoning taken to this conclusion, as I believe they misconstrue contract law. I respectfully dissent.
After performing the first delivery of oh, Arcadia made a claim under the parties’ charter agreement for one amount of demurrage, Sun countered with less, and Arcadia accepted. After the second delivery, Arcadia made a claim for one amount of demurrage, Sun made an “initial offer” (Sun’s own words) for less, Arcadia disputed one adjustment that Sun had made, Sun relented on that point, and Arcadia accepted. On these facts, the District Court concluded that these “settlement” agreements were unenforceable for lack of consideration because (1) the record was “devoid” of evidence of a dispute between the parties and (2) there were no mutual concessions by the parties. The District Court concluded that, because there were no enforceable settlement agreements reached, Arcadia was actually raising claims under the initial charter party agreements that were time-barred.
The District Court’s conclusion about the lack of consideration in these agreements runs counter to black-letter contract law. Sun offered a hypothetical to illustrate its position, arguing that this situation is akin to Arcadia agreeing to paint Sun’s house for $1 per square foot of wall space. Ironically, this hypothetical illustrates why Sun’s position is incorrect. Inevitably, the hypothetical painter and homeowner measure the wall space differently — just as Arcadia and Sun arrived at two different calculations of how much Sun owed for demurrage. When the parties eventually agree on a dollar figure, Sun argues this second agreement is not separately enforceable.
This is incorrect. When parties disagree about an unliquidated obligation and subsequently affix a dollar figure to that obligation, their second agreement is enforceable:
If the terms of a contract are such as to leave the amount payable for goods or services uncertain in amount, by reason of indefiniteness in modes of measurement or otherwise, a mutual agreement by which the uncertainty is removed by fixing a specific amount or by substituting a definite method of measurement is not invalid by reason of pre-existing legal duty. Whether it is unilateral or bilateral in form, there is consideration to support the substituted contract.
2 Corbin on Contracts § 7.17, at 442 (rev. ed.1995). In Yoder v. T.F. Scholes, Inc., 404 Pa. 242, 173 A.2d 120 (1961), a contractor was to receive “4% of net profit before taxes” and, prior to completion of the job, the parties agreed to the estimate of $12,330.58 for this amount. Id. at 121. When profits were less than anticipated, the Pennsylvania Supreme Court found that the second agreement, in which the parties affixed a dollar figure to the method of calculation provided in the initial contract, was separately enforceable because “[consideration for the new contract appears in the liquidation, before completion of the job, of an unliquidated amount by which the contract had to be calculated.” Id. at 122.
Like in Yoder, the parties in our case formed an initial contract in which one of Sun’s obligations depended on a calculation to be made in the future.[6] Like in Yoder, *170 the parties subsequently agreed to remove uncertainty by affixing a specific amount to an unliquidated obligation. Like in Yoder, the parties’ second agreement was supported by consideration that “appears in the liquidation ... of an unliquidated amount by which the contract had to be calculated.” Id. at 122.
The District Court first suggested that there was no consideration because there was no dispute between the parties. The undisputed facts say otherwise. In Pennsylvania, parties need only have a “bona fide,” “legitimate,” “honest,” or “good faith” disagreement before compromise of their position will be considered valid consideration. See Metz Contracting, Inc. v. Boxer Heights, Inc., 261 Pa.Super. 177, 395 A.2d 1373, 1376 (1978); Nowicki Const. Co., Inc. v. Panar Corp., N.V., 342 Pa.Super. 8, 492 A.2d 36, 40 (1985); Ciavarro v. Cost Control Mktg. & Mgmt., Inc., 412 Pa.Super. 273, 603 A.2d 214, 216-17 (1992). The two parties here took two different positions about how much demur-rage Sun was obligated to pay under the charter agreements. Sun does not allege that Arcadia’s initial claim for demurrage was illegitimate or made in bad faith. Sun argues that Arcadia is obligated to support its initial claim for demurrage to show that a dispute existed. Essentially, Sun argues that its position on the interpretation of the charter agreements was sound and, thus, there was no real dispute and no compromise. But once a Pennsylvania court finds two parties in honest disagreement, “[t]he sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party.” Metz Contracting, 395 A.2d at 1375. We need not revisit the merits of the parties’ positions in the underlying dispute to determine if Arcadia’s compromise was valid consideration.
The District Court also found no consideration because there were no mutual concessions between the parties.[7] This rings of a “pre-existing duty” doctrine argument: Sun offered to pay what it was already obligated to pay, so no new consideration supported Arcadia’s acceptance. The Pennsylvania Supreme Court has described why this argument fails within the context of accord and satisfaction:
Not infrequently, though a claim is ... the subject of a bona fide and reasonable dispute, it is conceded that at least a certain amount is due. While it would appear that in paying this conceded part of the claim, the debtor was merely doing what he was previously bound to do, the law looks upon an unliquidated or disputed claim as a whole and does not attempt to set a value upon it.... Accordingly, such a claim is dealt with ... as something the adequacy of which as consideration will not be measured.... [T]he payment of the amount admittedly due will support a promise to discharge the whole claim.
Cohen v. Sabin, 452 Pa. 447, 307 A.2d 845, 849 (1973) (quoting Williston on Contracts). Looking at the dispute as a whole, Sun had an unliquidated obligation in the initial charter agreements. By making claims for certain amounts of demurrage, Arcadia conceded that no more than those amounts were due. By countering with offers for less, Sun conceded that “at least a certain amount is due.” See Cohen, 307 A.2d at 849. Because Sun owed an unspecified amount of demurrage, an offer to pay a certain amount of demur-rage was new consideration. When Arcadia accepted, both parties were bound. *171 Sun could not refuse to make payments of $300,934.43 and $299,582.80 just as Arcadia could not successfully recover $400,000 and $450,000 in demurrage.
My colleagues in the majority do not discuss the District Court’s opinions about consideration. Rather, they understand the District Court to have merely “opined” about the validity of these subsequent settlements and to have reached its conclusion based on Arcadia’s claims being time-barred. The District Court did conclude that Arcadia’s claim was barred by the one-year contractual limitations period, but only after finding the subsequently reached agreements were unenforceable. My colleagues seem to accept that the subsequent agreements may be valid and enforceable, though nonetheless they find them time-barred.
I see no support for the notion that Arcadia is asserting a breach of the charter agreements. Arcadia’s Complaint asserted two counts of breach of contract — ■ one for each “settlement agreement.” App. at 5-8. Arcadia does not claim that Sun breached the charter agreements. Arcadia claims that Sun owes it money because it failed to pay sums it negotiated in late 2000, not because it promised to pay an unquantified amount of demurrage in the charter agreements reached in late 1999 and early 2000. Arcadia’s right to recover should stand or fall on the claims it actually made, not the claims that Sun has attributed to it. By characterizing Arcadia’s claims as breaches of the initial contracts, both the District Court and my colleagues have reinvented Arcadia’s claims as ones that are easier to reject.
On appeal, Sun repeatedly characterizes the back and forth between these parties as merely an “accounting.” My colleagues accept this characterization of the parties’ conduct. Neither Sun nor my colleagues clarify why this characterization is relevant to contract law. Arguably, this is an alternative rationale for affirming the District Court without accepting the conclusion than these subsequent agreements lacked consideration. I understand this argument to be that: (1) the parties were engaged in “accounting” — a process to calculate an amount owed by one of the parties, (2) the parties anticipated that this “accounting” would occur (as it is typical in shipping contracts), and, therefore, (3) Arcadia’s current claim was anticipated by and encompassed within the one-year time limit in the charter agreement. By this interpretation, enforceable, valid settlement agreements regarding demurrage between these two parties were only enforceable within one year from discharge of cargo.
I disagree because the third point does not logically follow from the first two. It is undisputed that the parties anticipated, planned for, and engaged in a process to determine how much demurrage was owed by Sun to Arcadia, a common practice in this industry. Indeed, Arcadia’s complaint described calculating demurrage after completion of the charters as “usual and customary.” App. at 6.[8] The parties *172 agreed to negotiate with each other for a year to see if they could resolve demur-rage disputes. Once the parties resolved how much demurrage was owed, however, Arcadia does dispute Sun’s contention that the charter agreements barred suits to enforce those agreements.
I believe that the most natural reading of the language used in the charter agreements supports Arcadia’s position. The language of the provision limits the time to litigate or arbitrate certain kinds of disputes about demurrage — disputes that are (1) “unresolved” and (2) “arising out of’ the initial charter agreement. In each charter agreement, Arcadia and Sun “agree that ... any [demurrage] claim or other unresolved dispute arising out of this Charter” would be waived “unless arbitration or litigation, as per this Charter, is commenced within one year after completion of discharge.” App. 180, 199. Litigation and arbitration are described in a provision in which the parties agree that “[a]ny and all differences and disputes that cannot be resolved between the parties shall be subject to litigation ... or in arbitration” in certain venues. App. 174, 193.
These provisions indicate that the one-year limit applies only to unresolved claims to recover demurrage made for breach of the charter agreements. The textual basis for this conclusion rests on “or other unresolved dispute arising out of this Charter” following the reference to demurrage claims. This phrase connotes that “any claim” for demurrage is a member of the broader set of disputes that are “unresolved” and that “aris[e] out of this Charter.”[9]
Contrary to the majority’s opinion, this interpretation does not nullify the one-year[1] time limit. If the amount of demurrage owed under a charter agreement “cannot be resolved between the parties,” then, within one year from discharge, the parties must litigate or arbitrate in the proper venue or waive the claim. A lawsuit in those circumstances would be a claim for demurrage that is an “unresolved dispute arising out of this Charter” and subject to the contractual time-limit. However, if the parties resolve how much demurrage is owed within that year by reaching a settlement, they can sue to enforce that settlement without regard to the contractual time limit. Such a lawsuit would not raise an “unresolved” demurrage claim, nor (as explained below) would that lawsuit assert a claim “arising out of this Charter.”
Arcadia’s claims are to enforce payment of negotiated settlement sums. Its Complaint asserts two claims seeking payments from Sun of amounts Sun promised in the context of settling demurrage claims. Neither of these claims was an “unresolved dispute arising out of’ the charter agreements. Indeed, the parties had resolved how much demurrage Sun owed to Arcadia *173 with regard to these shipments. Sun does not contend otherwise. It did not refuse to pay because it questioned whether it owed those amounts, but rather because it claimed the debt was offset by debts incurred in separate transactions.
Arcadia’s claims also do not arise from the charter agreement. As noted, Arcadia’s complaint asserted two counts of breach of contract — one for each settlement. App. at 5-9. It did not claim a breach of the charter agreements. It is an unremarkable proposition that a lawsuit to enforce a settlement agreement “arises” from a different source of law than the underlying claim. Cf. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (“The suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit. No federal statute makes that connection ... the basis for federal-court jurisdiction over the contract dispute.”); Ridgeway v. U.S. Life Credit Life Ins. Co., 793 A.2d 972, 977-78 (Pa.Super.Ct.2002) (holding that a statutory provision limited to claims “arising under an insurance policy” did not include claims for post-settlement or post-judgment conduct by insurer).
These contracting parties chose to include the modifiers “unresolved” and “arising out of this Charter” to describe the claims to which the one-year limitations period applied. The most natural reading is that these modifiers differentiate lawsuits in which parties seek to determine how much demurrage is owed from lawsuits seeking payment of agreed-upon amounts.
In addition, the contrary view leads to odd results. If the charter agreements bar enforcement of all settlement agreements after one year, Sun could negotiate until the 11th hour, settle, and simply not send a check. Arcadia could not, under this reading, litigate or arbitrate prior to the 11th hour settlement since the parties agreed to pursue such avenues only for disputes that “cannot be resolved between the parties.” Arcadia, thus, could not enforce the 11th-hour settlement because the claim would be waived by the time the breach occurs. For another example of an odd result, if the parties settled this case during this appeal, that settlement would be unenforceable by this interpretation. As the majority characterizes the current claim, a lawsuit to enforce a 2006 settlement could also be characterized as an attempt to “transmute” a claim for demur-rage into a claim for settlement enforcement.
My colleagues in the majority point out that Arcadia was given notice two days after it reached the second agreement that Sun was not going to make either payment as promised. The question is whether this act started a four-year clock or a four-month clock for Arcadia to enforce this agreement. On slightly different facts, it could have been a two-month, one-month, or even one-day clock, and this time-limit provision, as interpreted by the majority, could not remain reasonable and enforceable in all of these circumstances. See 42 Pa. Const. Stat. § 5501.
My colleagues also question why Arcadia waited four years to bring this lawsuit. Allowing four years for contracting parties to work out their differences before bringing contract disputes to court is a decision made in Harrisburg, not by this Court.
Finally, I find it difficult to understand how we can affirm the District Court on this alternative ground. Sun has not explained how the text of the one-year contractual time limit should be interpreted to encompass both claims made under the charter agreements as well as lawsuits to *174 enforce settlements of those claims.[10] In interpreting contractual limitations provisions, “the intent of the parties to a written contract is ascertained from that writing.” Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, 892 A.2d 830, 837 (Pa.Super.Ct.2006). Even if I agreed with Sun’s interpretation, I would be hesitant to conclude that the language of the charter agreements is so clear and unambiguous that Sun is entitled to judgment as a matter of law without a more precise explanation as to how the text of each charter agreement supports Sun’s position.
I disagree with the District Court because I believe that a Pennsylvania court would find the agreements reached by these two parties in September and October 2000 to be valid and enforceable. I disagree with my colleagues, as I believe that the text of the one-year contractual limitations period applies only to limit the amount of time the parties must attempt to resolve the amount of demurrage owed, not to limit the time to sue to enforce agreed-upon resolutions of these issues. I would remand to the District Court for further proceedings, and thus respectfully dissent.

. Sun essentially conceded before the District Court that its obligation to pay demurrage in the charter party agreements was unliquidated. See, e.g., App. at 107, 131.

. By describing the lack of "mutual concessions,” the District Court did not suggest, and Sun does not argue, that there was no mutual intent to be bound. See App. at 145. Rather, the District Court's conclusion regarding mutual concessions related to consideration. Id.

. The District Court attributed enormous significance to a statement by Sun’s representative that "[i]t is usual and customary with respect to vessel Charters for the parties to engage in an accounting for demurrage after discharge of the cargo.” App. at 147, 153. My colleagues also find this point significant.
I fail to see the same significance. In Pennsylvania, "custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts” because certain words may have "a special meaning” so that "members of that industry are presumed to use the words in that special way.” Sunbeam Corp. v. Liberty Mut. Ins. Co., 566 Pa. 494, 781 A.2d 1189, 1193 (2001). Trade custom is also "pertinent in determining whether Plaintiff accepted Defendant’s offer *172 or whether Plaintiff made a counter-offer.” Lobar, Inc. v. Lycoming Masonry, Inc., 876 A.2d 997, 1001 (Pa.Super.Ct.2005).
But Sun does not identify words in the charter agreements that are used in a special way or some manner of contract formation unique to the shipping industry. The undisputed — and undisputable — contention that it is "usual and customary” to account for demurrage after discharge does not support either party's position. It may be "usual and customary” to account for demurrage after discharge of the cargo and “usual and customary” for those subsequently agreed calculations to be considered separately enforceable. I fail to see why general contract law should not apply rather than a specialized rule for the shipping industry based only on the fact that shipping parties typically account for demurrage after discharge of cargo.

. For example, the phrase "any tomato, or other fruit,” indicates that tomatoes are considered fruits.

. Both parties stated their conclusions about the scope of the contractual limitations period with little discussion of the textual support for those conclusions. Sun contends that the limit encompassed all suits to recover unpaid demurrage. See Br. Appellee at 27 ("Arcadia had until [certain dates] ... to demand arbitration or institute litigation in connection with its demurrage claims to the extent they remained unpaid.”). Sun does not explain why they chose the modifiers "resolved” and "unresolved” to describe demurrage claims in the charter agreement to mean "paid” or “unpaid.”